[Cite as *In re G.P.*, 2026-Ohio-513.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| G.P. | : | CASE NOS. CA2025-09-102<br>CA2025-09-103 |
| | : | OPINION AND<br>JUDGMENT ENTRY<br>2/17/2026 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2021-0212

Garrett Law Offices, and Dawn S. Garrett, for appellant, Mother.

Anne Harvey Law LLC, and Anne Harvey, for appellant, Father.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Parachute: Butler County CASA, and Amy R. Ashcraft, for CASA.

Legal Aid Society of Southwest Ohio, LLC, and Jamie Landvatter, Guardian Ad Litem.

### O P I N I O N

**HENDRICKSON, P.J.**

{¶ 1} A mother and father separately appeal a decision of the Butler County Court of Common Pleas, Juvenile Division, awarding permanent custody of their son, G.P., to the Butler County Department of Jobs and Family Services ("the Agency"). For the reasons set forth below, we affirm the juvenile court's decision.

### I. FACTS & PROCEDURAL BACKGROUND

{¶ 2} G.P. was born on April 29, 2016 to Mother and Father, who were unmarried. On August 9, 2021, the Agency filed a complaint alleging that G.P. was a neglected and abused child. The complaint asserted that on August 8, 2021, law enforcement officers found Father and 5-year-old G.P. in the Trenton Municipal Park, where Father was setting up a tent because he was homeless. The complaint indicated Father was "well-known" for having severe drug addiction issues and Father had reported that he recently relapsed by using heroin. The complaint also alleged that Mother was incarcerated in the Middletown City Jail and had a history of drug use, including abusing pain pills, heroin, and crack cocaine. The complaint further indicated that Mother and Father had reported domestic violence within their relationship, with G.P. being present when the violence occurred. Mother had been hospitalized in February 2021 after Father broke her ribs. Mother reportedly held a knife to Father's throat and hit other family members on the head with a cast iron pan and choked them.

{¶ 3} G.P. was removed from Father's care and placed in the care of his Paternal Grandparents. Father, who had made threats of self-harm, was placed on a 72-hour hold at a local hospital.

{¶ 4} On August 9, 2021, the juvenile court entered an emergency ex parte order placing G.P. in the Agency's temporary custody and ordering that that a guardian ad litem ("GAL") be appointed for G.P. Following a shelter care hearing, G.P. was continued in the Agency's temporary custody, though he remained in his Paternal Grandparents' home. The juvenile court ordered that a court-appointed special advocate ("CASA") also be appointed to the case.

{¶ 5} Near the end of August 2021, Paternal Grandparents relinquished their care of G.P., indicating that that they could not handle his significant behavioral issues. G.P. was diagnosed with posttraumatic stress disorder (PTSD), disruptive mood deregulation disorder, and attention deficit hyperactivity disorder (ADHD) and was prone to verbal and physical attacks on others. G.P.'s behavioral issues were so severe that G.P. had to be hospitalized when he was relinquished from Paternal Grandparents' care. Upon his release from the hospital in mid-September 2021, he was placed in his first foster home.

{¶ 6} On September 20, 2021, following admissions made by Mother and Father, G.P. was adjudicated a dependent child. The complaint for neglect was withdrawn by the Agency. The parties waived bifurcation and the matter proceeded directly to disposition. G.P. was continued in the temporary custody of the Agency. By this time, Mother was no longer in jail. Mother and Father were awarded supervised visitation with G.P., but the court suspended visitation until Mother and Father could produce clean drug screens.

{¶ 7} The Agency created a case plan for Mother's and Father's reunification with G.P., and this plan was adopted by the juvenile court. The case plan required that Mother and Father complete a substance abuse and mental illness ("SAMI") assessment and follow through with all recommendations, complete a psychological evaluation and follow through with all recommendations, engage in mental health counseling, engage in

domestic violence services, complete parenting classes, participate in the Employment Success Program, submit to random drug screens, and obtain and maintain stable housing and income.

{¶ 8} Mother and Father began to work on the case plan, both undergoing SAMI and psychological assessments. It was recommended that Mother participate in a substance abuse treatment program, including a partial hospitalization program, and engage in mental health counseling that included trauma-informed counseling. Father was diagnosed as bipolar and suffering from PTSD. It was recommended that he participate in an outpatient substance abuse program. Mother and Father engaged in services, albeit with limited or mixed results.

{¶ 9} Mother initially sought substance abuse treatment in January 2022 with Sojourner Recovery Service, but she left Sojourner's program after one day. Mother then began services at Access Counseling; however, she left Access Counseling after a short period of time. Mother next sought treatment at Brightview Recovery. By February 2022, Mother was receiving treatment through Modern Psychiatry and Wellness ("MPW"). Mother had entered residential drug treatment at MPW, where she also received mental health counseling. Mother's treatment at MPW later shifted to intensive outpatient services.

{¶ 10} Near the end of February 2022, Mother began participating in the juvenile court's Family Treatment Drug Court (hereafter, "drug court"). For a period of time, Mother complied with her treatment program and remained sober. She advanced from "phase 1" to "phase 3" in drug court. However, in August 2022, Mother relapsed. On August 2, 3, and 16, 2022, Mother tested positive for cocaine. On August 17, 2022, she tested positive for cocaine and fentanyl. On August 23, 24, and 26, 2022, Mother tested positive for

cocaine. In September 2022, Mother was sent back to jail for 35 days after she was found in violation of her probation. Around this time, she was also arrested for possession of drugs. On November 3, 2022, Mother was unsuccessfully terminated from drug court. Following her release from jail, Mother reengaged in services through MPW. Mother continued to struggle with her sobriety, testing positive for cocaine on multiple occasions from February 2023 to April 2023 when screened by MPW or the Agency.

{¶ 11} As for Father, by September 2021, he was engaged in drug treatment and counseling services through Access Counseling. In January 2022, he engaged in services with Brightview Recovery. In drug screens administered in November 2021, December 2021, and January 2022, Father tested positive for methamphetamine, amphetamine, cocaine and fentanyl.

{¶ 12} In February 2022, Father entered residential inpatient treatment through MPW. Father did well in maintaining his sobriety for a period of time, and he transitioned to intensive outpatient services. During this time, Father was routinely engaged in his individual and group counseling services, both for his mental health and substance abuse issues. However, in August 2022, Father relapsed and used cocaine. He self-reported his drug use to MPW and recommitted himself to his drug treatment.

{¶ 13} While Mother and Father worked on case plan services, the Agency requested and was granted an extension of temporary custody of G.P. on May 20, 2022. In January 2023, after being in two different foster homes, G.P. was placed in the home of Paternal Grandparents. On February 2, 2023, the juvenile court terminated the Agency's temporary custody of G.P. and awarded temporary custody to Paternal Grandparents. However, on April 19, 2023, the juvenile court terminated Paternal Grandparents' temporary custody and returned temporary custody of G.P. to the Agency

after it was discovered that Paternal Grandparents were living out of their vehicle, had permitted G.P. to have more than ten unexcused absences from school, and had failed to ensure G.P. was taking his mental health medication. G.P. was placed in a foster home. In November 2023, due to worsening behavior issues, G.P. was placed at New Path Child & Family Solutions (hereafter, "New Path"), a residential facility. G.P. has remained in this residential facility.

{¶ 14} On May 5, 2023, the Agency was granted a second extension of temporary custody by the juvenile court. Two months later, on July 7, 2023, the Agency moved for permanent custody of G.P. However, a hearing on the permanent custody motion was repeatedly delayed for a variety of reasons, including scheduling issues, health problems of the parties' attorneys and a magistrate, and the need to twice appoint Mother new counsel after prior counsel withdrew.

{¶ 15} While waiting for the permanent custody hearing to commence, Mother and Father continued to work on case plan services, with Mother and Father both completing a domestic violence course. Both also enrolled in parenting classes. In August 2023, Mother and Father had a second child together, B.P. Mother initially retained custody of B.P., with the Agency having protective supervision over the child. However, in November 2023, after Mother relapsed and began using cocaine again, the Agency obtained temporary custody of B.P.[1] Though B.P. was placed in a foster home, she and G.P. interacted with one another during Mother's and Father's visits with the children.

{¶ 16} In November and December 2023, Mother tested positive for cocaine. During this time, she failed to attend multiple group or individual therapy sessions at MPW.

---

1. The present appeal involves only the grant of permanent custody of G.P. to the Agency. Proceedings involving B.P. remained pending in the juvenile court at the time Mother and Father filed their respective notices of appeal in G.P.'s case. This Opinion will therefore focus on the facts and procedural history relevant only to proceedings involving G.P.

Near the end of February 2024, Mother tested positive for amphetamine, methamphetamine, and cocaine in a drug screen administered by the Agency. At the beginning of March 2024, she was unsuccessfully discharged from MPW.

{¶ 17} Near the end of March 2024, Mother began outpatient services for her substance abuse issues with Sunrise Treatment Center. However, Mother continued to use illegal drugs during this time. In screens administered by the Agency in May, June, July, September, October, and November 2024, Mother either tested positive for cocaine, cocaine and fentanyl, or a combination of cocaine, methamphetamine, amphetamine, fentanyl, and norfentanyl. Mother also tested positive for drugs when screened by staff at the Family Healing Center, the location where she had visitation with G.P. and B.P. Mother tested positive for cocaine on April 8, 2024 and September 9, 2024, and positive for cocaine and fentanyl on December 2, 2024.

{¶ 18} At the beginning of January 2025, Mother was arrested on charges of theft and possession of drugs. After being convicted of theft, Mother spent 52 days in the Butler County Jail. Once released, Mother began services at Full Circle Recovery. Mother moved on campus at Full Circle and lives in a sober-living-residence.

{¶ 19} As for Father, from approximately September 2022 through May 2024, he maintained his sobriety and continued to regularly attend his substance abuse treatment and mental health counseling. However, in June 2024, Father relapsed and tested positive for amphetamine, cocaine, fentanyl, and gabapentin. At the time, Father had indicated stress had been a contributing factor to his relapse. Father recommitted himself to his substance abuse treatment and mental health counseling.

{¶ 20} Throughout the pendency of the case, Mother and Father both regularly visited with G.P. at the Family Healing Center, though Mother's visitations were interrupted

by periods of incarceration. Early on in the case, around August 2022, both Mother and Father had their visits suspended due to ongoing drug use. Their visits did not resume until they provided three consecutive clean drug screens. At times, Mother's and Father's visitations were held together; other times they visited with G.P. individually. Neither Mother's nor Father's visitations with G.P. ever progressed beyond supervised visitation.

{¶ 21} The permanent custody hearing finally commenced before a magistrate on July 3, 2024, nearly a year after the Agency moved for permanent custody. It was continued in progress for nine months, until April 8, 2025 and April 15, 2025. While the permanent custody motion was pending, Father filed a motion for legal custody of G.P., seeking to have Paternal Grandparents made the legal custodians of G.P. in the event that neither he nor Mother were granted custody of G.P.[2] Father's motion was then scheduled for April 8, 2025 and April 15, 2025.

### A. Testimony from the July 3, 2024 Hearing

{¶ 22} At the initial hearing on the Agency's motion for permanent custody, the Agency introduced testimony from four witnesses: a therapist and licensed social worker from New Path, a former foster father of G.P., an instructor from the Development of Living Skills ("DLS") program, and visitation specialist with the Family Healing Center.

### 1. New Path Therapist

{¶ 23} The therapist and licensed social worker from New Path testified that G.P. had been residing at the residential facility since December 2023. When G.P. first entered the facility, he was assessed and diagnosed with ADHD and an "other specified trauma

---

2. Notably, Paternal Grandparents never filed an R.C. 2151.353 statement of understanding with the juvenile court. "The required statement of understanding—set forth in R.C. 2151.353(A)(3)(a) thru (d)—ensures that the legal custodian, who is not moving on their own for legal custody, understands the special responsibility and permanence involved in accepting legal custody of a child or children." *In re B.L.*, 2018-Ohio-547, ¶ 24 (12th Dist.).

or stressor-related disorder." The therapist explained that the "other specified trauma or stressor-related disorder" designation is used when there is a history of suspected abuse or neglect that is believed to be related to the symptoms of the patient, but there is not enough specific information to be able to identify any of the specific disorders that fall under the category, such as PTSD, a disinhibited social engagement disorder, or a reactive attachment disorder.[3] As a result of his ADHD, G.P. struggles to focus, has trouble sitting still or waiting his turn, struggles with impulsivity, talks excessively, and often interrupts others. Behaviors associated with his other specified trauma or stressor-related disorder include difficulty with self-regulation and aggression, oppositional and refusal-based behaviors, and a history of making suicidal ideation statements and statements of wanting to harm others out of anger.

{¶ 24} The therapist noted that G.P. has frequently been violent towards his peers and the staff at New Path, often hitting or kicking people out of anger. He also uses profanity when he becomes upset. The therapist opined that G.P.'s behaviors and language were not typical of an 8-year-old, the age G.P. was at the time of the July 3, 2024 hearing. While at New Path, G.P. attends individual therapy and day treatment programming, engages in therapeutic behavior services and case management services, and, during the school year, attends educational services.

{¶ 25} The therapist indicated that there has been some improvement in G.P.'s behavior since entering New Path. As G.P.'s vocabulary improved, his use of profanity decreased, except during periods of escalation. Additionally, while G.P.'s aggression still happens frequently, the therapist noted the severity has, at times, gone down. Though

---

3. G.P. had previously been diagnosed as having PTSD. The New Path assessment shifted the PTSD diagnosis to the "other specified trauma or stressor-related disorder."

G.P. has been at New Path since December 2023, the therapist stated there is no discharge plan or foreseeable discharge date for G.P. The therapist testified that when G.P. is discharged, he needs a structured and nurturing environment that promotes positive behavior and appropriately redirects his aggressive behaviors. G.P.'s caregiver needs to be able to provide "co-regulation" by doing the coping skills with G.P. and needs to be consistent with post-discharge recommendations, such as outpatient therapy, case management, attending medical appointments, and administering medication.

### 2. Foster Father

{¶ 26} The foster father who provided care for G.P. prior to G.P. being placed at New Path testified at the hearing. G.P. was in foster father's home from July 2023 until December 2023. Foster father spoke about G.P.'s various behavioral issues which caused concern not only for G.P., but also for others around G.P. Foster father testified that G.P. often acted out when not getting his way, using profanity and racial slurs, threatening to kill others, becoming aggressive and assaulting others, including once using a broom to strike a school principal, and trying to run away. Foster father testified that G.P.'s behavior became too extreme and he needed a higher level of care, one that New Path could provide.[4]

### 3. DLS Instructor

{¶ 27} The DLS instructor who worked with both Mother and Father testified about their progress in the program. The DLS instructor explained that DLS offers parenting

---

4. There was some discussion at the July 3, 2024 hearing from foster father that he had continued to visit G.P. after G.P. was placed at New Path. Foster father had indicated a willingness to have G.P. placed back into his home after G.P. completed treatment at New Path. However, by the time the permanent custody hearing reconvened in April 2025, circumstances had changed and foster father was no longer a viable placement for G.P.

courses and money management courses in an effort to teach life skills to parents so that children can be kept safe in the parents' homes.

{¶ 28} The DLS instructor testified that Mother and Father started working with DLS in September 2023. The instructor initially met with the parents individually for one hour each week, meeting Mother in her apartment and meeting Father at the DLS office. Eventually, Father moved into Mother's apartment and the DLS instructor met with both parents at the same time. The goals DLS set for Mother and Father were to communicate better with one another, for Father to take accountability for his role in G.P.'s removal from his and Mother's custody, and for both parents to improve their parenting skills, which included setting limits for G.P. and keeping a safe household by avoiding drug use and domestic violence incidents.

{¶ 29} The DLS instructor testified that both Mother and Father completed the DLS program by attending all the lessons, but they received only a "core exit" with a recommendation that if G.P. were to be returned to either parents' care, the parents would need to continue participation with DLS. The instructor explained that a "core exit" meant that the parents attended all their DLS lessons, but they did not complete their goals. The instructor had concerns about G.P.'s safety if he were placed back in the care of his parents, as Mother had relapsed and continued to use drugs and Father had not engaged in improving his parenting skills. The DLS instructor noted that instruction was given in how to set limits with G.P. and handle his behavioral issues. While Mother had gained knowledge into setting limits with G.P. and used some of those skills during her visits with G.P., Father discounted information shared by DLS and was unwilling to apply the skills being taught to him. The DLS instructor explained that when she gave Father a suggestion, he would refuse to try the suggestion claiming that "he knew how to parent

his child and he didn't need parenting skills, that he did fine on his own prior to [G.P.]'s removal." Father told the DLS instructor that "what he was doing always worked for him." The DLS instructor also testified that Father made "no progress" in accepting accountability for G.P.'s removal from his care, blaming either Mother or Paternal Grandparents for the Agency's involvement.

### 4. Family Healing Center Visitation Specialist

{¶ 30} A visitation specialist with the Family Healing Center testified about Mother's and Father's visits with G.P. The parents' visitations at the Center started in August 2021. At times, the Center would drug screen Mother and Father. Mother's and Father's visits started at "Level One," which meant that a supervisor was in the room for the entire visit, showing the parent how to provide structure for the child and redirecting the parents as needed. The goals for Mother's and Father's visits were for them to provide structure, manage G.P.'s behavior, and actively engage with G.P. The visitation specialist supervised visits that G.P. had with his parents individually as well as visits that were shared by both parents.

{¶ 31} Once the parents started visiting G.P. separately, Mother's visitations advanced to "Level Two," which meant that the visit remained supervised, but the supervisor was less hands-on, allowing the parent to actively parent with less redirection. It took longer for Father, but he eventually also rose to "Level Two" visitation at the Center.

{¶ 32} The visitation specialist noted that during the parents' visitation, G.P. often acted out by throwing chairs, flipping over tables, using obscene language, hiding under tables, or trying to run out of the room. The visitation specialist testified that G.P.'s behavior problems were less present during Father's visits. However, when G.P. did misbehave or needed redirection, Father was not open to feedback from the Center's

supervisor. Rather than providing structure for G.P. and telling him "no" when he misbehaved, Father allowed G.P. to do whatever he wanted. Father often acted more like a friend to G.P. than a parent. The visitation specialist also testified that there were times when Father had age-inappropriate conversations and play with G.P., requiring the visitation specialist to instruct Father not to discuss or play games involving fighting or violence.

{¶ 33} The visitation specialist testified that unlike Father, Mother was open to feedback on how to manage G.P.'s behavior during visits. Mother would tell G.P. "no" and attempt to redirect his bad behaviors during visits, which led to G.P. acting out more in her presence. Mom often needed assistance from the visitation specialist in managing G.P.'s behaviors. In the three or four months before the July 3, 2024 hearing, the visitation specialist noted behavior that was concerning from Mother, i.e., Mother had started to withdraw her engagement during the visits, often nodding off or sleeping.

{¶ 34} The visitation specialist noted that before he could recommend that Mother or Father have unsupervised visitation with G.P., he would need to see improvement by both parents. Mother needed to have more active engagement with G.P. Father needed to work on his parenting skills and provide more structure for G.P. during visits.

**B. Testimony from the April 8, 2025 Hearing**

{¶ 35} At the April 8, 2025 hearing, the juvenile court heard testimony from the Agency caseworker assigned to G.P.'s case, Paternal Grandmother, and Father.

**1. Agency Caseworker**

{¶ 36} The caseworker testified about the Agency's involvement, G.P.'s placement history and behavioral issues, and Mother and Father's progress on the case plan. The caseworker explained that the Agency became involved in August 2021 when it was

discovered that Father was homeless and setting up a tent in Trenton Municipal Park for himself and G.P. Mother was incarcerated at the time. Both Mother and Father had a history of drug usage and had reported domestic violence within their relationship, with the violence occurring when G.P. was present.

{¶ 37} The caseworker testified that though the Agency was given temporary custody of G.P., he was placed in his Paternal Grandparents' home. However, less than a month later, after being unable to handle G.P.'s severe behavioral issues, Paternal Grandparents relinquished their care. After a brief period of hospitalization, G.P. entered foster care. G.P. "bounced around" various foster homes, changing placements when his behavioral issues became too severe for the various foster families to handle. At the beginning of 2023, after Paternal Grandparents completed a Family Preservation Program, G.P. was placed in Paternal Grandparents temporary custody. Paternal Grandparents' custody was terminated on April 19, 2023 after it was discovered that Paternal Grandparents were living out of their vehicle, permitted G.P. to miss more than ten days of school, and were not giving G.P. his prescribed mental health medications. Temporary custody was again awarded to the Agency and G.P. was placed back into foster care. G.P. again bounced around various foster homes before being moved to New Path in December 2023.

{¶ 38} The caseworker described the behavioral issues that led G.P. to being placed at New Path, noting that G.P. used racial slurs, became inconsolable when upset, kicked and hit his foster parents, school staff members, and his peers, threw furniture, made threats against his teachers and classmates, and was nearly expelled from school. Despite being medicated and receiving services at New Path, G.P.'s behaviors have

persisted. The caseworker described G.P.'s progress in New Path as "minimal to none" and noted that she receives multiple incident reports involving G.P. every week.

{¶ 39} The caseworker testified that G.P.'s behaviors were at his worst when he was in Paternal Grandparents' care. Though Paternal Grandparents are the only extended family members who have expressed an interest in taking custody of G.P., the Paternal Grandparents did not pass an updated home study.[5] Additionally, the Agency had concerns about Paternal Grandparents ability to care for G.P., with the caseworker testifying that Paternal Grandparents had inconsistent housing, an inability to manage G.P.'s behaviors, and a history of not administering G.P.'s prescribed medication. Paternal Grandmother also had a history of minimizing G.P.'s behaviors and mental health concerns.

{¶ 40} Regarding Mother's progress on case plan services, the caseworker noted that Mother's progress has been hindered by her drug use. Following Mother's SAMI evaluation, Mother did engage in mental health and substance abuse services. Since the start of the case, Mother has sought treatment from a number of providers, including Sojourner Recovery Services, Brightview Recovery, Access Counseling, MPW, Sunrise Treatment, and Full Circle Recovery. She also participated in drug court. Mother has not been successfully discharged from any treatment program and she was unsuccessfully terminated from drug court. Despite receiving services and engaging in treatment for multiple years, Mother continued to struggle with her sobriety, using cocaine, fentanyl, methamphetamine, amphetamine, or combinations of these drugs throughout much of the case. Mother's last positive drug screen occurred approximately four months before

---

5. According to the caseworker, the agency had taken efforts to place G.P. with various family members on both Mother's and Father's side of the family. While Maternal Grandfather contacted the Agency early on in the case, he failed to respond to subsequent contacts from the Agency. Other than Paternal Grandparents, no other family members have expressed an interest in custody of G.P.

the April 8, 2025 hearing, when Mother tested positive on December 2, 2024 for cocaine and fentanyl.

{¶ 41} The caseworker testified that following Father's SAMI evaluation, he began participating in substance abuse and mental health treatment at Sojourner Recovery Services. However, Father was unsuccessfully discharged after less than a week. He then sought treatment at Access Recovery before moving on to MPW. Though Father takes medication for his PTSD and bipolar diagnoses, he was unable to provide a list of the medications when asked by the Agency in January 2025. Father's last positive drug screen was on June 14, 2024, when he tested positive for amphetamines, cocaine, fentanyl, and gabapentin. From reports the caseworker receives from MPW, Father is compliant and actively engaged in substance abuse and mental health counseling services.

{¶ 42} Mother and Father both completed domestic violence courses at MPW and both completed a parenting course offered by DLS. However, the caseworker noted, Mother and Father had only received "core exits" from DLS as their progress with the program was "minimal." Father voluntarily found and attended two additional parenting classes offered by Talbert House's Fatherhood Project—"The Journey to Co-Parenting" and "The Nurturing Father's Program."

{¶ 43} The caseworker also testified about Mother's and Father's visitations with G.P., noting that in the more than three-and-one-half years the case had been pending, neither Mother nor Father had progressed to unsupervised visitation with G.P. The caseworker observed Mother's and Father's individual visits with G.P., as well as their shared visits. The caseworker testified that Mother was more of an authority figure who provided parental guidance during visits. When G.P.'s behaviors were problematic,

Mother was the one to correct and address the behaviors. Father was more focused on playing with G.P., and did not redirect G.P.'s behaviors. Father tended to justify or excuse G.P.'s behaviors. The caseworker testified that though Father completed a parenting course through DLS, he did not make any changes in his parenting techniques.

{¶ 44} The caseworker noted that though Mother used more parenting techniques during her visits, the Agency nonetheless had concerns about Mother's visitations with G.P. In addition to missing a significant number of visits due to periods of incarceration, Mother also visited G.P. while under the influence of drugs. The caseworker testified that Mother had tested positive for drugs on three separate tests administered by the Family Healing Center. She tested positive for cocaine on April 8, 2024 and on September 9, 2024 and positive for cocaine and fentanyl on December 2, 2024. The Agency also had concerns about Mother's ability to stay awake and engage with G.P. during visits, noting that she had nodded off on multiple visits. The caseworker noted that on one occasion, during a visit where Father was also present, Mother stole Father's debit card and withdrew $250 without Father's permission. Father elected not to press charges.

{¶ 45} Finally, the caseworker testified about Mother's and Father's employment and housing during the course of G.P.'s case. The caseworker testified that though Mother has had several jobs throughout the pendency of the case, Mother has not been consistently employed. Father has not had a job during the almost four years of Agency involvement. He does, however, receive supplemental security income from the government. The caseworker indicated that stable housing has been an issue for both Mother and Father. When the Agency became involved in August 2021, Father was homeless and Mother was in jail. Once Mother was released from jail, she and Father lived together in a house they rented, but they were unable to keep it. Around the time

B.P. was born in August 2023, Mother and Father were living together in an apartment. They lost this apartment after Mother started using drugs again. Mother spent some time at Hope House, a homeless shelter in Middletown, Ohio. Father spent some time at City Mission Gospel, a homeless shelter in Cincinnati, Ohio. At the time of the April 2025 permanent custody hearing, Mother was residing in a sober-living residence on or near Full Circle's campus. Father was participating in a "Rapid Rehousing" program through City Mission Gospel and was renting a subsidized apartment in Cincinnati, where he was responsible for paying only 25 to 30 percent of the monthly housing costs.

{¶ 46} The caseworker noted that G.P. had been in the Agency's custody for almost four years and was in need of permanency and stability. Despite efforts by the Agency to reunify the parents with G.P., the Agency did not believe Mother or Father were capable of providing stability for G.P., as many of the same concerns that existed at the start of the case still existed at the time of the permanent custody hearing. The caseworker testified there were still concerns about the parents' ability to maintain sobriety and to provide stable housing and income. The caseworker also had concerns about the parents' ability to manage G.P.'s behavioral issues. The caseworker noted that Father does not appear to recognize the severity of G.P.'s issues and is either not prepared or capable of managing G.P.'s issues and behaviors. The caseworker therefore opined that it was in G.P.'s best interest for permanent custody to be granted to the Agency.

## 2. Paternal Grandmother

{¶ 47} Paternal Grandmother testified that she was 73 years old and Paternal Grandfather was 75 years old. Paternal Grandfather was in poor health and would soon be undergoing surgery. Following his surgery, it was expected that Paternal Grandfather would need to go into a nursing home for rehabilitation. Paternal Grandmother testified

that she and Paternal Grandfather were not "currently living at a permanent address." They hoped to get an apartment in Hamilton, Ohio. Though she and Paternal Grandfather are both retired and receive a limited monthly income from social security, Paternal Grandmother expressed a willingness to obtain a part-time job to help financially support G.P. if she was able to obtain custody.

{¶ 48} Paternal Grandmother testified that she last saw G.P. two years ago, when he was removed from her temporary custody in April 2023. She testified that when G.P. lived with her, he was a "typical little boy," though he admittedly had behavioral issues while attending school. When asked about the amount of schooling G.P. missed while he was in her custody, Paternal Grandmother acknowledged that G.P. missed 17 days in a three-month period, though she blamed his absences on a bus driver. She denied that G.P. was not given his prescribed mental health medication while in her care.

{¶ 49} Paternal Grandmother was cross-examined about her relationship with Mother. She admitted that she and Mother have a rocky past that included an instance of domestic violence that occurred in G.P.'s presence. She denied, however, using derogatory, race-based slurs to refer to Mother.

### 3. Father

{¶ 50} Father testified that he currently lives in an apartment in Cincinnati, one that he has been renting since December 2024. He currently pays 30 percent of his monthly rent and the remainder is paid by City Mission Gospel. However, starting July 1, 2025, Father testified he was going to be responsible for paying the full amount of his monthly rent—$839. Father is unemployed and has not had a job during the nearly four years of Agency involvement. He also has not engaged in the Employment Success Program, explaining that his focus has been on getting "things settled" with respect to his mental

health, medication, and substance abuse issues. Father does not have a driver's license and relies on public transportation or ride-share services to get around. He receives $967 a month in social security income. Father believes that his income is sufficient to support himself and G.P., as he would be able to obtain additional assistance, i.e., housing assistance and food stamps, if G.P. was placed in his care.

{¶ 51} Father acknowledged that he has a history of drug abuse, which began at a young age. Father had previously been convicted of possession of drugs in the Fairfield Municipal Court and was on probation.[6] However, Father testified that he has committed himself to his treatment and has been drug free since relapsing in June 2024. He further explained that when he relapsed, it was "not like months [of use];" rather, he "hit it one time or something." Father testified he attends both substance abuse and mental health counseling weekly. Father has been prescribed medication for his mental health diagnoses and he regularly takes his meds. Father testified he completed the domestic violence course and parenting course the Agency wanted him to take and took two additional parenting courses through Talbert House. Father indicated a willingness to repeat the DLS parenting program if necessary.

{¶ 52} Father testified that he visits with G.P. weekly at the Family Healing Center. Though he has not officially progressed beyond "Level Two" supervised visits, he claimed that he has been on a "trial run" at "Level Three" visits. According to Father, this involves him being unsupervised with G.P. for one hour of a two-hour visit. Father testified he and G.P. get along great and enjoy playing together. Father rewards G.P. for his good behavior and G.P. tends not to have violent outbreaks in Father's presence.

---

6. It is unclear from the record when Father's conviction for possession of drugs in Fairfield Municipal Court occurred.

**{¶ 53}** Before Father's testimony was completed, the magistrate recessed proceedings for the day. Father resumed testifying at the start of the April 15, 2025 hearing.

### C. Testimony from the April 15, 2025 Hearing

### 1. Father's Continued Testimony

**{¶ 54}** When Father's testimony resumed, Father continued to testify about his parenting style, noting that he tends to be more "laid back" and focused on G.P.'s good behaviors. When G.P. starts acting out, Father tries to redirect him. Father testified that G.P. has done really well playing with B.P. at shared visits. He indicated that G.P. has never been aggressive towards B.P. or Father at visits.

### 2. Mother's Testimony

**{¶ 55}** Mother testified that she has been living in a sober-living residence in Dayton near Full Circle since February 17, 2025. Mother is participating in a four-month program at Full Circle where she engages in intensive outpatient services five days a week. The services include substance abuse treatment and counseling and mental health counseling. Mother is randomly drug screened at Full Circle and has been consistently testing negative for illegal substances.

**{¶ 56}** Mother acknowledged that she has a history of using heroine, crack cocaine, fentanyl, methamphetamine, THC, and Xanax. However, she has been clean since December 26, 2024. Mother testified that she last relapsed and "spiraled out of control" when B.P. was removed from her care.

**{¶ 57}** Mother testified that she has been in jail on four different occasions since the Agency became involved in August 2021. She most recently spent 52 days in jail following a conviction in January 2025 for theft. She is currently on probation following

convictions in two different courts, Middletown Municipal Court (theft) and Fairfield Municipal Court (possession of drugs).

{¶ 58} Mother testified that G.P. "learned things way younger than he should have" while he was in her and Father's custody. G.P. witnessed domestic violence incidents between her and Father and he heard Father calling her derogatory names. Mother believed that G.P. learned racist words from Paternal Grandmother. Mother testified that she and Paternal Grandmother do not have a good relationship, as Paternal Grandmother has "never liked [her]" because of "[her] color."

{¶ 59} As of the April 15, 2025 hearing, Mother was not employed, though she claimed to have a job interview lined up. Mother hopes to obtain an apartment in Dayton once she has completed her program at Full Circle. She believes Full Circle will assist her with finding suitable housing for her and G.P. Mother has looked into a church daycare for childcare if G.P. is returned to her custody.

### 3. GAL's Recommendation & In Camera Interview

{¶ 60} Following Mother's testimony, the magistrate indicated it had received and reviewed the GAL's report and recommendation, which had been filed with the court the day before, on April 14, 2025. The GAL's report recommended that the Agency be granted permanent custody of G.P. The magistrate noted the late filing of the report and offered to give the parties two weeks to review the report and then reconvene if the parties wished to cross-examine the GAL about the report or her recommendation. The parties asked for a brief recess to review the GAL report, which was granted. Once the hearing resumed, both Mother and Father indicated that they had reviewed the report and did not wish to cross-examine the GAL about the report or her recommendation.

{¶ 61} The magistrate took the matter under advisement. On May 15, 2025, the magistrate held an in camera interview with G.P. to discuss his wishes.

### D. The Decision

{¶ 62} On May 23, 2025, the magistrate issued a decision in which it denied Father's motion for legal custody or, alternatively, to have G.P. placed in Paternal Grandparents' custody and granted the Agency's motion for permanent custody. The magistrate found that G.P. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period and that a grant of permanent custody to the Agency was in G.P.'s best interest. Mother and Father filed objections to the magistrate's decision, arguing that the decision was not supported by sufficient evidence, was against the manifest weight of the evidence, and was contrary to G.P.'s best interest. On August 5, 2025, following a hearing, the juvenile court overruled Mother's and Father's objections and adopted the Magistrate's Decision in full.

### II. ANALYSIS

{¶ 63} Mother and Father separately appealed the juvenile court's decision, each raising a single assignment of error for review. For ease of discussion, we will address the assignments of error together.

{¶ 64} Mother's Sole Assignment of Error:

{¶ 65} THE TRIAL COURT'S DECISION TO GRANT THE AGENCY PERMANENT CUSTODY OF THE CHILD IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 66} Father's Sole Assignment of Error:

{¶ 67} THE TRIAL COURT'S FINDING THAT PERMANENT CUSTODY TO THE AGENCY IS IN THE BEST INTEREST OF G.P. IS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 68} In their individual assignments of error, both Mother and Father challenge the weight and sufficiency of the juvenile court's determination that permanent custody was in G.P.'s best interest.

{¶ 69} Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the State must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 2015-Ohio-4315, ¶ 11 (12th Dist.), citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). Under R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 2014-Ohio-2580, ¶ 9 (12th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 2014-Ohio-2896, ¶ 21 (12th Dist.); R.C. 2151.414(B)(1). Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 2015-Ohio-3709, ¶ 10 (12th Dist.). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re H.G.*, 2023-Ohio-4082, ¶ 58 (12th Dist.).

**{¶ 70}** "Because R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, 'the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination[.]'" *In re E.V.*, 2024-Ohio-192, ¶ 25 (12th Dist.), quoting *In re Z.C.*, 2023-Ohio-4703, ¶ 11.[7] Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision, while weight of the evidence relates to the issue of persuasion and the effect of the evidence in inducing belief. *In re Z.C.* at ¶ 13; *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley* at ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.).

**A. "12 of 22" Finding**

**{¶ 71}** With respect to the second part of the two-part permanent custody test, the juvenile court determined that G.P. has been in the Agency's temporary custody for at

---

7. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

least 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d). Neither Mother nor Father contest the juvenile court's 12 of 22 determination, and the record reflects that G.P. had been in the Agency's temporary custody for over 19 months of a consecutive 22-month period at the time the Agency moved for permanent custody.[8]

## B. Best Interest Finding

{¶ 72} The only issue remaining is whether an award of permanent custody to the Agency was in G.P.'s best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 2018-Ohio-3341, ¶ 32 (12th Dist.). These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 2018-Ohio-1687, ¶ 22 (12th Dist.),

---

8. "The Ohio Supreme Court has explained that when determining whether a child has been in the agency's custody for 12 of the previous 22 months, the relevant time period to consider is the 22 months prior to the date the permanent custody motion was filed." *In re L.D.*, 2025-Ohio-2892, ¶ 107 (12th Dist.), citing *In re C.W.*, 2004-Ohio-6411, ¶ 26. Further, in meeting the statutory 12-of-22 provision, the Supreme Court has recognized that "the child might have been placed in the agency's custody for one continuous period or the child might have been placed in the Agency's custody, removed from the agency's custody, and then returned to the agency's custody." *In re N.M.P.*, 2020-Ohio-1458, ¶ 23. The latter situation describes what occurred in G.P.'s case. G.P. was adjudicated a dependent child on September 20, 2021 and remained in the Agency's temporary custody until February 2, 2023, when he was briefly placed in Paternal Grandparents' custody. G.P. was in Paternal Grandparents' custody until April 19, 2023, when he returned to the Agency's temporary custody. The Agency moved for permanent custody on July 7, 2023, making the relevant 22-month period under R.C. 2151.414(B)(1)(d) September 7, 2021 through July 7, 2023. During that time, G.P. was in the Agency's custody for over 19 months—from September 20, 2021 through February 2, 2023 (nearly 16.5 months) and from April 19, 2023 to July 7, 2023 (approximately 2.5 months).

citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102, at ¶ 19.

{¶ 73} "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *Id.* at ¶ 31. Furthermore, no one best-interest factor is given greater weight or heightened significance pursuant to R.C. 2151.414(D)(1). *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Nor is any one factor dispositive. *In re R.D.*, 2021-Ohio-3780, ¶ 25 (12th Dist.). R.C. 2151.414(D)(1) "does not prioritize the factors. The juvenile court must be free to use its discretion to determine the relative weight to be accorded to the factors based on the particular circumstances of the case before it." *In re J.L.M.*, 2016-Ohio-2773, ¶ 23 (12th Dist.).

{¶ 74} The record reflects that the court considered the best interest factors set forth in R.C. 2151.414(D) and found that it was in G.P.'s best interest to grant permanent custody to the Agency. Mother and Father challenge the court's finding. Mother argues the weight of the evidence demonstrates a "family relationship worth preserving" and shows that, by the time of the hearing, she was doing better with her substance abuse issues. Father similarly argues that the juvenile court failed to give sufficient weight to the bond he and G.P. share and the progress he had made on the case plan, which included completing domestic violence and parenting courses and making great strides in his

substance-abuse recovery, his mental health stability, and his living arrangements. Father further argues that the juvenile court judged his parenting style too harshly.

{¶ 75} Following our review of the record, we find no merit to Mother's or Father's arguments. The juvenile court's best interest determination is supported by clear and convincing evidence and is not against the manifest weight of the evidence. The juvenile court considered G.P.'s relationship with Mother, Father, Paternal Grandparents, and his sibling. With respect to Paternal Grandparents, the court noted G.P. has not seen them in over two years, and when last placed in their care, G.P. was not properly medicated, did not regularly attend school, and was living out of a car. As for his relationship with his sister, the court noted that though G.P. and B.P. have never resided in the same home, the two developed a bond with one another at shared visitations. As for Mother and Father, the juvenile court recognized that "both parents love [G.P.] and he loves them. There is a child-parent bond with each." The court further noted that both Mother and Father had "maintained their relationship" with G.P. over the duration of the lengthy case.

{¶ 76} Though G.P. shares a strong bond with Mother and Father, and both regularly attended visits with him, except for Mother during periods of incarceration, neither parent ever progressed beyond supervised visitation. As of the date of the final permanent custody hearing, April 15, 2025, Mother and Father had been visiting G.P. at the Family Healing Center for more than three-and-one-half years. They had each completed parenting courses. Despite this, neither parent had progressed to unsupervised visitation. Though Mother had made an effort to implement parenting techniques she had been taught, Mother's ongoing substance abuse issues and failure to remain attentive and engaged during visits remained a concern.

{¶ 77} As for Father, his failure to take responsibility for his role in G.P.'s removal and his failure to implement parenting techniques also remained a concern. Testimony from the visitation specialist, the DLS instructor, and the Agency caseworker all indicated that Father felt he knew how to best handle G.P.'s behavioral issues and he was not open to feedback from others. As the juvenile court noted, Father "does not try to set boundaries for [G.P.]" and does not "[set] a limit on his behaviors." Rather, Father just leads G.P. away from inappropriate actions towards other actions. The court found this strategy flawed, noting that "[i]t does nothing to provide [G.P.] with the knowledge regarding what behaviors are unacceptable and provides him with no reason to modify his bad behaviors. Father's strategy is the opposite of parenting." Though Father feels the court judged his parenting style "too harshly," the court's criticism of Father's parenting approach was supported by testimony from the Agency's witnesses. The Agency caseworker, DLS instructor, and visitation specialist all described deficiencies in Father's approach to parenting. As the visitation specialist noted, Father appeared more interested in acting like a friend to G.P. than a parent and was uninterested in employing new techniques for handling G.P.'s behaviors.

{¶ 78} In addition to considering the child's relationship with his parents and paternal relatives, the juvenile court also considered G.P.'s custodial history, his current living situation, and his wishes, as expressed during an in camera interview. The court also considered the recommendation of the GAL, as expressed in her written report. As the juvenile court noted, G.P. has been moved from placement to placement throughout the pendency of this case. With the exception of a brief two-and-one-half month period where Paternal Grandparents had temporary custody of G.P. in early 2023, G.P. has been in the Agency's temporary custody since August 2021. As the juvenile court noted, though

G.P. can, at times, be a "verry appropriate, sweet, imaginative, and fun-loving boy," his significant behavioral issues have led to him changing foster placements a number of times. Concern not only for G.P.'s safety, but also the safety of others in his proximity, be it his foster parents, his peers and fellow students, school personnel, or other caregivers, led to G.P. being placed at New Path in December 2023. Although G.P. resides at New Path, G.P. has been visiting with B.P. The foster parents caring for B.P. have, according to the GAL's report, indicated a desire to begin visiting with G.P. with an eye towards a possible placement in their home once he is discharged from New Path. As the juvenile court noted, "the possibility of placement in a home where he is known and where he has a family connection is promising." The GAL recommended permanent custody be granted to the Agency.

{¶ 79} The record reflects that the juvenile court also considered Mother's and Father's progress on case plan services, G.P.'s need for legally secure placement, whether such placement could be achieved without a grant of permanent custody to the Agency, and whether the conditions that led to the Agency's involvement had been remedied. With respect to Mother, the juvenile court noted that throughout the pendency of the case, Mother had "criminal justice related issues" and ongoing substance abuse issues. Mother had gone from "one treatment provider to another." As of the date of the last permanent custody hearing, Mother was only four months sober. She had tested positive for cocaine and fentanyl on December 2, 2024. Mother had no job, was living in a sober-living-residence, and had not successfully completed any substance-abuse treatment program. Mother had not remedied the conditions that led to G.P.'s removal. As the juvenile court noted, "even if [Mother] is successful [in working her way through a

treatment program], she will not likely be in a position to take [G.P.] into her care for a significant period of time."

{¶ 80} As for Father, the juvenile court noted that Father was "doing objectively better" than Mother with respect to his "substance use and overall stability." As of the time of the final permanent custody hearing, Father had been sober for ten months. His last positive drug test was on June 14, 2024, when he tested positive for amphetamine, cocaine, fentanyl, and gabapentin. Father was regularly attending substance abuse and mental health counseling and was living in his own apartment. However, as the juvenile court noted, "Father's financial situation and residential situation are far from stable, despite his protestations to the contrary." Father was residing in an apartment where he was responsible for paying only 30 percent of rent and expenses. The remaining portion of his rent and expenses were paid through a Rapid Rehousing program through City Mission Gospel. The funding from the Rapid Rehousing program was expected to end soon, which would require Father to use nearly all of his monthly social security income, $967, to cover his monthly rent of $839. Father had not sought a job or engaged in the Employment Success Program during the three-and-one-half years the case was pending. Father had also not obtained a driver's license, relying on public transportation or paying for ride-share services to get around. The stability of Father's income and housing remained a concern as of the time of the final permanent custody hearing.

{¶ 81} Father's ability to care for and handle G.P.'s needs also remained a concern. Though Father had voluntarily taken two parenting courses through Talbert House and completed the DLS parenting program, Father continued to refuse to accept responsibility for his role in G.P.'s removal from his and Mother's custody and refused to utilize the various parenting techniques that had been taught. As the juvenile court noted, Father

discounted or challenged the information that he had been given, "[e]ssentially [taking] the position that he was right, and the [DLS] instructor was wrong."

{¶ 82} The record reveals that G.P. is in need of legally secure permanent placement. With the exception of a two-and-one-half month period, he has been in the Agency's temporary custody since August 2021. Despite reasonable efforts by the Agency to assist Mother and Father in meeting case plan objectives to reunify with the child, neither parent has demonstrated the ability to provide a safe and stable environment for G.P. As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 2022-Ohio-3101, ¶ 45 (12th Dist.), quoting *In re D.E.*, 2018-Ohio-3341, at ¶ 60. The juvenile court's decision granting permanent custody to the Agency provides this for the child. Accordingly, we find that the juvenile court's decision to grant permanent custody of G.P. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

## III. CONCLUSION

{¶ 83} Having found that the juvenile court's decision to grant permanent custody of G.P. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence, we overrule Mother's and Father's assignments of error.

{¶ 84} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Mike Powell, Judge